[S.F. No. 23494. Feb. 28, 1977.]

ROBERT EUGENE NIPPER, Plaintiff and Appellant, v.
CALIFORNIA AUTOMOBILE ASSIGNED RISK PLAN et al.,
Defendants and Respondents.

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉

## COUNSEL

McCormick, Barstow, Sheppard, Coyle & Wayte, Stephen R. Cornwell and James P. Wagoner for Plaintiff and Appellant.

Bagley, Bianchi, Hoskins & Rosenberg, Bianchi, Hoskins & Rosenberg, Albert Bianchi, Peter C. Morris and Stutsman & Nagel for Defendants and Respondents.

Peter W. Fisher, Alan E. Lacy, James R. Woods, Maloney, Chase, Fisher & Hurst, Ball, Hunt, Hart, Brown & Baerwitz, Joseph A. Ball, Clarence S. Hunt, Joseph D. Mullender, Jr., Staiger, Yank, Molinelli & Preston, Frank E. Preston and Warren A. Staiger as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**RICHARDSON, J.**—This case presents the question whether an insurance broker and an association of insurers providing assigned risk automobile insurance to an allegedly unqualified or incompetent driver may be held civilly liable for personal injuries sustained by third persons as a result of the insured's negligent operation of a motor vehicle. Under these circumstances we conclude that liability is unwarranted and will affirm judgments of dismissal.

Plaintiff was injured in January 1973 when the pickup truck he was driving collided with a car driven by the insured, H. K. Warkentin. Plaintiff sued Warkentin and other defendants, including California Automobile Assigned Risk Plan (CAARP) and H. B. Klassen and Klassen & Ratzlaff (a licensed insurance broker and his agency, hereinafter collectively referred to as Klassen). After demurrers interposed by both CAARP and Klassen were sustained without leave to amend, plaintiff proceeded to trial against Warkentin and obtained a judgment against him for $200,000, of which $170,000 remains unsatisfied. On appeal, plaintiff contends that the demurrers were improperly sustained. We examine, successively, plaintiff's claims of liability as against CAARP and Klassen.

▉▉▉▉▉▉▉▉▉

## 1. LIABILITY OF CAARP

Plaintiff's causes of action against CAARP alleged the following facts which, for purposes of reviewing the rulings below, we accept as true. (*Scott* v. *City of Indian Wells* (1972) 6 Cal.3d 541, 549 [99 Cal.Rptr. 745, 492 P.2d 1137].) CAARP is an unincorporated association of insurance companies organized under Insurance Code section 11623 (unless otherwise indicated, all statutory references are to the Insurance Code). Its function is to administer the assigned risk automobile insurance program which is established by sections 11620-11627. In November 1971 Warkentin was 79 years of age and incapable of operating an automobile safely because of lack of mental capacity and alertness, and senility. On October 5, 1971, Klassen, acting on behalf of Warkentin, submitted to CAARP Warkentin's signed application for liability insurance in the amount of $15,000. At this time Klassen allegedly had personal knowledge of Warkentin's inability to operate an automobile safely, but failed in the application to disclose this information to CAARP. CAARP assigned the issuance of Warkentin's liability policy to United Services Automobile Association (United) thereby inducing Warkentin to believe that he could operate an automobile safely.

CAARP's application form allegedly failed to require applicants to submit information regarding their mental or physical capacity for driving, and had such information been sought or furnished, as required by law, neither CAARP nor United would have issued the policy. Further, it is alleged that, in the event CAARP had notified the Department of Motor Vehicles (DMV) of its rejection of Warkentin's application, the DMV would thereupon have revoked Warkentin's drivers license, and that, deprived of both license and insurance, he would not have been operating his vehicle on the date of the accident. The complaint concludes that CAARP's omissions to elicit information regarding Warkentin's infirmities, to reject his assigned risk application, and to notify the DMV thereof, in conjunction proximately and foreseeably caused the accident to plaintiff, a member of the motoring public.

### a. *CAARP's Statutory Obligations.*

Plaintiff's principal contention is that the applicable statutory provisions and administrative regulations, taken together, imposed an affirmative duty upon CAARP to obtain from prospective applicants for assigned risk coverage information regarding their mental and physical

condition, to reject the insurance applications of those lacking the ability to operate a motor vehicle safely, and to inform the DMV of such rejection. An analysis of this contention requires a close examination of the statutory basis of CAARP.

The assigned risk plan at issue was created pursuant to section 11620 et seq. The history of the plan's operation, and its change in character from voluntary to compulsory, are well documented and have left clear tracks. (See *Cal. State Auto. etc. Bureau* v. *Downey* (1950) 96 Cal.App.2d 876, 880-887 [216 P.2d 882].) The general purpose of the plan was to provide automobile insurance for those marginal motorists who, because they were considered "bad risks," were otherwise unable to secure and maintain such insurance. (*Id.,* at p. 881; see *Billington* v. *Interinsurance Exchange* (1969) 71 Cal.2d 728, 740 [79 Cal.Rptr. 326, 456 P.2d 982].) These persons included "violators of traffic laws, . . . persons with minor physical disabilities, the young and the old drivers, and, of course, those who had bad accident records." (*Cal. State Auto., supra,* at pp. 881-882.) To this extent the plan complements the state's financial responsibility laws by providing a limited fund of insurance to compensate persons injured by drivers who otherwise would be uninsurable. (See *Barrera* v. *State Farm Mut. Automobile Ins. Co.* (1969) 71 Cal.2d 659, 670-671 [79 Cal.Rptr. 106, 456 P.2d 674]; *Interinsurance Exchange* v. *Ohio Cas. Ins. Co.* (1962) 58 Cal.2d 142, 153-154 [23 Cal.Rptr. 592, 373 P.2d 640]; *Cal. State Auto., supra,* at p. 880; Sen. Interim Com. on Vehicles and Aircraft Rep. on The Financially Irresponsible Motorist, Supp. to Appendix to Sen. J. (1955 Reg. Sess.) pp. 5, 7-10.) By way of illustration, in the present case plaintiff recovered $15,000 of his judgment from United, Warkentin's assigned risk carrier.

In furtherance of the foregoing purpose, under section 11620, the Insurance Commissioner is empowered to issue (and thereafter to amend) ". . . a reasonable plan for the equitable apportionment, among insurers admitted to transact liability insurance, of those applicants for automobile bodily injury and property damage liability insurance who are in good faith entitled to but are unable to procure such insurance through ordinary methods." Section 11623 authorizes the subscribing insurers to form their own organization to administer and operate the plan, subject to review by the Insurance Commissioner, and it is under this section that CAARP administers the plan at issue.

We focus attention primarily on section 11624, which details the various component elements which the plan *"shall"* contain. These

include, among others, standards for determining eligibility of applicants (subd. (a)), procedures for making application for insurance and apportioning eligible applicants among the subscribing insurers (subd. (b)), a provision that the administering organization (CAARP) shall notify the DMV of the name of each rejected applicant for insurance and the statutory ground for rejection (subd. (c)), and rules and regulations governing operation and administration of the plan (subd. (d)).

With respect to eligibility standards, and of special moment to our inquiry, section 11624, subdivision (a), provides that ". . . in establishing such standards the following *may* be taken into consideration in respect to the applicant . . . . [¶] (1) His criminal conviction record; [¶] (2) His record of suspension or revocation of a license to operate an automobile; [¶] (3) His automobile accident records; [¶] (4) *His age and mental, physical and moral characteristics which pertain to his ability to safely and lawfully operate an automobile*; [¶] (5) The condition or use of the automobile." (Italics added.)

Although plaintiff argues that CAARP in determining insurability was *required* by the foregoing language of subdivision (a) to investigate and consider applicant Warkentin's age, and his mental and physical condition, the section leads us to conclude that CAARP is vested with discretion to determine whether such factors should be included among the standards for eligibility. We note, initially and most importantly, that the section itself specifically provides that age and the described characteristics *may* be considered. Our conclusion is further supported by section 16 which, recognizing the familiar semantic distinction, specifically provides that the term " 'shall' is mandatory and . . . 'may' is permissive, unless otherwise apparent from the context." From the language of section 11624 itself, fairly read, it is clear that the Legislature intended a differential application of these two terms, providing as it does that the assigned risk plan "shall" contain standards of eligibility which "may" include age, and mental and physical condition, of the applicant. It is apparent that the Legislature prefaced consideration of age and mental, moral, and physical characteristics with discretionary and permissive language while retaining in the same section clear mandatory language relating to the four generalized constituent elements which a plan must contain. This language is consistent with the demonstrated legislative purpose of extending and broadening insurance coverage to high risk applicants. (*Cal. State Auto. etc. Bureau* v. *Downey, supra,* 96 Cal.App.2d 876.) Had the Legislature intended otherwise, there

was readily available language to accomplish such a purpose. It was not used.

The foregoing conclusion is supported by the court's analysis in *Vice* v. *Automobile Club of So. Cal.* (1966) 241 Cal.App.2d 759 [50 Cal.Rptr. 837], involving a somewhat similar situation. In *Vice,* plaintiff sued an automobile club for negligence in issuing an automobile liability policy to one Wyne, an unlicensed 87-year-old man with impaired vision and hearing. Among other arguments, plaintiff in *Vice* had contended that section 11624 and the standards of eligibility described therein made it unlawful for the club to issue insurance to a person of Wyne's age and physical condition. In rejecting the contention, the court concluded that "It is likely that the sections cited are not compulsive but were intended to furnish criteria under which an insurer would be permitted to reject an application for insurance under the assigned risk plan." (*Id.,* at p. 765.)

Similarly, sometime ago in the *Cal. State Auto.* case, *supra,* the court observed that the Insurance Commissioner had been given "great discretion" in determining the kinds of risks which the assigned risk plan would accept. (See 96 Cal.App.2d at p. 907.) The appellate court assumed throughout its opinion, properly, that section 11624, and the eligibility standards contained in subdivision (a) thereof, were permissive, not mandatory. (*Id.,* at pp. 900-906.)

We also find significance in certain features disclosed in the administrative history of the regulations pertaining to the required contents of the assigned risk plan. These regulations, of course, implement section 11624. This history discloses the Insurance Commissioner's view that the eligibility standards of that section are permissive, not mandatory. Prior to June 1971 the approved plan contained various specified eligibility restrictions. (See Cal. Admin. Code, tit. 10, former §§ 2431-2437.) Applicants were considered ineligible for insurance if they had been convicted of certain offenses (former § 2431), were addicted to drugs (former § 2431.1a), were habitual excessive users of alcohol (former § 2431.2a), or were persons with "a major mental or physical disability" (former § 2431.5a).

However, in June 1971 (prior to the occurrence of the events before us) the foregoing sections of the plan were repealed and section 2430 was adopted in their place. Section 2430 provides that, as a prerequisite for consideration under the plan, an applicant must certify that he has

attempted, within 60 days prior to his present application, to obtain liability insurance and was unable to secure it through ordinary means. Further, "An applicant so certifying shall be considered for assignment upon making application in good faith to the Plan. An applicant shall be considered in good faith if he reports all information of the [*sic*] material nature and does not willfully make incorrect or misleading statements in the prescribed application form, or does not come within any of the prohibitions or exclusions listed below." (§ 2430.) There follow three exclusions which render an applicant wholly ineligible: (1) failure to hold, or ineligibility to obtain, a drivers license (unless it can be restored upon proof of financial responsibility); (2) failure to pay premiums to an automobile insurer during the past 12 months; or (3) the applicant's risk includes use of a motor vehicle in carrying passengers for hire, when the seating capacity exceeds 16 persons, or use for the transportation of certain dangerous or explosive materials.

It thus appears that instead of continuing those previous eligibility standards which might have excluded persons such as Warkentin, the present regulation, section 2430, in operation since June 1971, extends coverage to most licensed drivers who are otherwise unable to obtain coverage through the usual methods. The reason for the substantial change in eligibility policy is revealing and is explained in a 1971 decision by the Insurance Commissioner, Ruling No. 174-A, of which we may take judicial notice. (Evid. Code, § 452, subd. (c).) This decision which summarized the results of hearings held by his office regarding various proposed amendments to the assigned risk plan contained the following statement: "The Hearings developed unanimous approval of the recommendation of the Governing Committee that the eligibility requirements for participation in the Plan should be broadened and expanded to the end that *the only requirement for coverage thereunder is the possession of a valid and unrevoked operator's license* either at the time of making application for the coverage, or the automatic reinstatement of such license following the provision of such insurance coverage. Such amendments will delete from the existing plan many present exclusions and exceptions from eligibility from participation therein which time and experience have now dictated to be outmoded and inharmonious with the driving conditions which presently pertain on the streets and highways of California . . . ." (Ruling p. 4, italics added.)

It is apparent that the Insurance Commissioner, who is authorized by law to issue the plan, has assumed that the eligibility standards set forth in section 11624 are permissive standards which need not be considered

by CAARP in processing applications for insurance. In fact, by reason of the 1971 amendments to the Administrative Code, CAARP *must* (with minor exceptions not herein relevant) provide insurance to all licensed drivers. As a corollary, with few exceptions, those carriers authorized by law to write liability insurance *must* participate in the plan (§ 11625) on the apparent theory that, for the purpose of extending insurance coverage as widely as possible, insurers in sharing the greater risks in the liability field must "take the bad with the good."

We have generally accorded respect to administrative interpretations of a law and, unless clearly erroneous, have deemed them significant factors in ascertaining statutory meaning and purpose. (E.g., *Mudd* v. *McColgan* (1947) 30 Cal.2d 463, 470 [183 P.2d 10]; *Noroian* v. *Department of Administration* (1970) 11 Cal.App.3d 651, 655 [89 Cal.Rptr. 889].)

Plaintiff responds to the foregoing analysis, however, by insisting that the Insurance Commissioner errs in his interpretation of the Insurance Code provisions at issue herein. Plaintiff places special emphasis upon subdivision (c) of section 11624 which, as noted above, requires CAARP to notify the DMV of both the rejection of any insurance applicant and the statutory reason therefor. Plaintiff reasons that the Legislature would not have enacted this provision had it intended CAARP to possess discretion to ignore the eligibility standards of subdivision (a). We find this analysis, however, unconvincing, for it is equally reasonable to conclude that the Legislature intended the DMV notification provision to apply only to those discretionary eligibility standards chosen by CAARP for evaluating assigned risk insurance applicants.

Plaintiff urges that CAARP's statutory responsibilities include, in effect, an investigative or policing function, in supplement of the DMV, to "weed out" unsafe or unqualified drivers. While acknowledging that, to a degree, the prompt performance by CAARP of its reporting function is of material aid to the DMV this duty by no means is CAARP's principal one. Furthermore, plaintiff's interpretation of the statutes conflicts with the primary purpose of CAARP which is, as we have noted, the wider extension of "assigned risk" insurance to drivers who, because of their past driving record or present age or mental or physical condition, are otherwise unacceptable risks for ordinary coverage. (See *Cal. State Auto. etc. Bureau* v. *Downey, supra,* 96 Cal.App.2d 876, 881.) It is the DMV, not CAARP, which is entrusted with the primary authority

and statutory responsibility of determining which California drivers are capable of driving safely. (See Veh. Code, §§ 12500 et seq., 12805, subd. (f) [inability to operate a motor vehicle safely is ground for denial of license].) Doubtless it is aided in its task by the prompt discharge of the reporting function of CAARP, as it is assisted by the reports of police and other state and local agencies.

The imposition upon CAARP, however, of general civil liability to members of the motoring public for CAARP's failure to investigate and "screen out" potentially dangerous drivers would serve to defeat that primary purpose of the assigned risk plan. To avoid such tort liability, CAARP would be under almost irresistible compulsion to reject doubtful or borderline applicants. (See *Matthias* v. *United Pacific Ins. Co.* (1968) 260 Cal.App.2d 752, 754-755 [67 Cal.Rptr. 511].) This in turn would reduce rather than increase the number of insured drivers on California's streets and highways. In our view, the strong public policy of extending insurance coverage which underlies the existence of the plan itself outweighs any countervailing policy favoring the utilization of CAARP, in effect, as an auxiliary arm of the DMV in the general policing or control of the driving qualifications of California's motorists. Since we cannot assume that those who are desiring coverage will cease driving, the inevitable result will be to increase the number of uninsured motorists among the very class possessing the highest risks.

We conclude that CAARP had no *statutory* obligation to inquire regarding Warkentin's driving ability.

b. *CAARP's Common Law Obligations.*

Plaintiff contends that, regardless of the presence or absence of any statutory obligations, CAARP owed a *common law* duty of care toward plaintiff and all other members of the motoring public. Plaintiff's reasoning is that CAARP was obligated to take affirmative steps to assure that incompetent drivers such as Warkentin would be denied liability insurance, thereby inhibiting their desire to drive. A failure to take such steps, it is urged, constitutes the breach of a general duty of care owed to all those who, in reasonable anticipation, might be adversely affected by the breach. Given the various policy considerations discussed above, however, we cannot agree with such a contention.

The general principles applicable in such situations were recently expressed by us as follows: "[W]hen the avoidance of foreseeable harm

requires a defendant to control the conduct of another person, or to warn of such conduct, the common law has traditionally imposed liability only if the defendant bears some special relationship to the dangerous person or to the potential victim." (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 435 [131 Cal.Rptr. 14, 551 P.2d 334]; see *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 48-49 [123 Cal.Rptr. 468, 539 P.2d 36]; Rest.2d Torts, § 315.) Plaintiff has cited no authority, and we are aware of none, which suggests that an insurer (or other person to whom an application for insurance is tendered) either stands in a special relationship with the applicant or his potential victims, or alternatively owes any affirmative duty of inquiry or disclosure regarding the applicant. (See *Matthias* v. *United Pacific Ins. Co., supra*, 260 Cal.App.2d 752, 755-756 [no special relationship between liability insurer and either insured or victim of insured's negligence].)

Plaintiff urges that such a special relationship with the general motoring public arises from the "quasi-public" nature of the agency charged with administering the state's assigned risk plan. As we have seen, however, the applicable statutes do not expressly create any such distinctive connection or duty of care. Assuming without concluding that the defendant, statutorily authorized, is a public (or quasi-public) agency, that fact alone is an insufficient basis upon which to predicate a common law duty to the motoring public in general, or to plaintiff in particular. (See, e.g., *Tarasoff* v. *Regents of University of California, supra*, 17 Cal.3d 425, 444 [police officers have no special relationship or duty of care to either the tortfeasor or his victim].)

Thus, either on statutory or common law grounds, we conclude that plaintiff's complaint failed to state a cause of action against CAARP for its failure to inquire regarding Warkentin's ability to operate a motor vehicle, or to reject Warkentin's application, or to notify the DMV thereof.

### 2. LIABILITY OF KLASSEN

The allegations in plaintiff's causes of action against Klassen are substantially identical to those set forth with respect to CAARP. In addition, plaintiff alleged that in October 1971 Travelers Indemnity Company (Travelers) had refused to insure Warkentin because Klassen had furnished Travelers with a letter from Warkentin's physician which stated that Warkentin was unable to drive safely because of senility; that on October 5, 1971, Klassen filled out Warkentin's application for

assigned risk insurance with CAARP and certified he had included all "required" information given him by Warkentin; that Klassen wilfully omitted furnishing CAARP with the letter from Warkentin's physician; and that Klassen owed a duty to the motoring public to furnish that letter to CAARP.

The preceding discussion of CAARP's liability would appear dispositive of the action against Klassen. As explained above, CAARP had no statutory or common law duty to inquire regarding Warkentin's mental or physical condition. In fact, CAARP would have been required by the applicable administrative regulations to accept Warkentin's application under the plan, despite any doubts it might have had regarding his ability to operate a motor vehicle. His case fell within none of the exceptions recognized in the regulations which bound both CAARP and Klassen. It follows, accordingly, that Klassen's alleged knowledge of Warkentin's senility, and the alleged failure to disclose that knowledge to CAARP, is wholly immaterial and would not give rise to a cause of action in favor of plaintiff.

It should be noted, further, that imposition of liability under the circumstances of this case could result in undesirable consequences in future cases. Klassen, as Warkentin's agent, owed to Warkentin an affirmative duty of securing assigned risk insurance for him if it could be obtained legally. Imposition of tort liability upon a broker for his failure to volunteer unrequested information regarding the applicant's ability to operate a motor vehicle would create a substantial conflict of interest. The broker in such a situation would be required to choose between serving his client's best interests in obtaining coverage, on the one hand, or protecting himself against personal liability to any member of the motoring public by voluntarily disclosing unsolicited information of a type which cannot affect the carrier's obligation to extend coverage in any event. Such a rule, in our view, would inevitably cause brokers to refuse to seek for their high risk clients assigned risk coverage. This would thereby defeat the clear public policy favoring such insurance. We by no means condone concealment, intentional or otherwise, of informational material called for by insurance applications or questionnaires. We also recognize that in the instant case had there been revealed the information unfavorable to Warkentin there would have been no different result insofar as assigned risk coverage was concerned. Accordingly, we hold that Klassen's obligations to CAARP (and to plaintiff) were satisfied by furnishing only that information sought by CAARP in its application form.

The case raises conflicting policy considerations. We think that to impose tort liability on CAARP and Klassen would be to narrow rather than to broaden insurance coverage of California highway accidents and, by decreasing rather than by increasing the number of insured motorists, serve to defeat the demonstrated legislative intent underlying the creation of the assigned risk plan.

The judgments of dismissal are affirmed.

Mosk, J., Clark, J., Wright, J.,* and Sims, J.,† concurred.

**TOBRINER, Acting C. J.**—I dissent.

I agree with the majority that plaintiff has no valid claim against the California Automobile Assigned Risk Plan (CAARP). CAARP bears no statutory or common law obligation to consider whether individuals who seek its insurance are fit drivers. I cannot agree, however, that plaintiff's complaint states no conceivable viable claim against the insurance agent Klassen. In my view, the majority reaches its contrary conclusion either by improperly usurping the function of the trier of fact or by narrowly reading plaintiff's complaint in violation of the accepted canons of appellate review.

I see no justification for a conclusion that an insurance agent stands free of any duty whatsoever to the public at large in the event that the agent, in the course of dealing with a client, acquires information suggesting that the client is unfit to drive. A bartender who knows that a customer will drive his car owes a duty to the public not to continue to serve drinks to the customer once the customer becomes obviously intoxicated. (*Vesely* v. *Sager* (1971) 5 Cal.3d 153, 164-167 [95 Cal.Rptr. 623, 486 P.2d 151]; see also *Bernhard* v. *Harrah's Club* (1976) 16 Cal.3d 313, 324-325 [128 Cal.Rptr. 215, 546 P.2d 719].) If a patient tells a psychiatrist that he intends to kill someone, the psychiatrist may owe a duty to the intended victim to warn the victim. (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 433-444 [131 Cal.Rptr. 14, 551 P.2d 334].) A bank owes a duty to homeowners to exercise

*Retired Chief Justice of California sitting under assignment by the Acting Chairman of the Judicial Council.

†Assigned by the Chairman of the Judicial Council.

supervisory responsibility if it puts itself in such a position that it can judge the adequacy of the plans of a housing developer to whom it has lent money. (*Connor* v. *Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850, 864-867 [73 Cal.Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224].) An insurance company owes a duty to all members of the public who might be injured by a negligent motorist to investigate promptly a motorist's insurability once the company has issued a policy to the motorist. (*Barrera* v. *State Farm Mut. Automobile Ins. Co.* (1969) 71 Cal.2d 659, 674-677 [79 Cal.Rptr. 106, 456 P.2d 674].) The situation of the insurance agent does not seem to me to be distinguishable from that of the bartender, the psychiatrist, the bank, and the insurance company: clearly, the agent owes some duty to the public.

Not surprisingly, therefore, the majority does not contend that an insurance agent may ignore the public interest. Instead, the majority concludes only that, should an agent acquire information indicating that a client is unfit, the agent need not inform CAARP. The majority suggests that this conclusion follows inexorably from its prior conclusion that CAARP need not consider an applicant's fitness.[1]

The majority's approach is grounded in either of two improper assumptions. On the one hand, the majority may assume that CAARP would do nothing with the information as to unfitness, that the agent consequently would accomplish nothing by informing CAARP, and therefore that the agent cannot possibly be negligent if he decides not to inform CAARP. It is not necessarily the case, however, that CAARP, because it need not consider fitness in issuing insurance, would simply throw such information away. Conceivably, CAARP officials could decide to pass the information on to officials at the Department of Motor Vehicles (DMV). If CAARP officials took this course, the DMV might

---

[1] The majority also argues that holding the insurance agent liable for his failure to report the fitness information to CAARP would require the agent to choose between his duty to his client to obtain insurance coverage and his personal interest in avoiding tort liability. All too often, the majority fears, agents will resolve their conflict of interest by refusing to seek high risk insurance for their clients. I fail to see the conflict of interest. As the majority demonstrates, CAARP need not and does not take fitness into account in passing on insurance applications. If an agent forwards fitness information to CAARP, he would not block his client from obtaining insurance. Moreover, tort liability is not likely to chill significantly agents' willingness to seek insurance for high risk clients. The steps which an agent must take, in order to fulfill his duty of care, are obvious and not costly: to protect himself fully, an agent need only notify CAARP, the DMV, and the client himself of the client's evident unfitness.

revoke the unfit individual's license,[2] the individual might decide not to drive, and members of the public might therefore escape the risk of injury occasioned by this particular individual's unfitness.

Plainly, we cannot decide what CAARP officials would do with information as to unfitness or what the insurance applicant would do if his driver's license were revoked. These are questions of *fact,* to be left to the trier of fact aided by the trial process. The majority's conclusion, if it rests on such inevitably factual determinations, usurps the function of the trier of fact.

Alternatively, the majority's approach could reflect a decision to hoist plaintiff on his own petard. In his complaint, plaintiff linked his claim against the insurance agent to his claim against CAARP by arguing that the agent's breach of duty followed from the fact that CAARP, had it been informed of the information as to unfitness, would have denied the applicant insurance, and that the applicant, if not insured, would have ceased to drive his car. The majority, on this view, would hold plaintiff to his logic: since plaintiff treated CAARP's duty as the premise of his argument, the majority, once it rejects this premise, apparently sees no injustice in also rejecting plaintiff's conclusion.

Our function, however, is not to teach plaintiff the false charm of symmetry. The trial court dismissed plaintiff's complaint without leave to amend. We must judge whether the trial court, in taking this action, abused its discretion. (See *La Sala* v. *American Sav. & Loan Assn.* (1971) 5 Cal.3d 864, 876 [97 Cal.Rptr. 849, 489 P.2d 1113].) Our concern is not so much with the defects in plaintiff's complaint as with the possibility that plaintiff will be able to cure those defects. "It is axiomatic that if there is a reasonable possibility that a defect in the complaint can be cured by amendment or that the pleading liberally construed can state a cause of action, a demurrer should not be sustained without leave to

---

[2]In this case, Klassen, the insurance agent, had in his possession a letter from a physician stating that Warkentin, the applicant for insurance, was senile and therefore unfit to drive. Vehicle Code section 13359 authorizes the DMV to "revoke the privilege of any person to operate a motor vehicle upon any of the grounds which authorize the refusal to issue a license." (See also Veh. Code, § 13800.) Vehicle Code section 12805, subdivision (f), prior to July 1, 1976, declared that "[t]he department shall not issue or renew a driver's license to any person . . . . [w]hen it appears by examination or other evidence that such person is unable to operate a motor vehicle upon a highway safely because of physical or mental defect or lack of skill." The DMV, therefore, would have had grounds to revoke Warkentin's license had it received a copy of the physician's letter.

amend." (*Minsky* v. *City of Los Angeles* (1974) 11 Cal.3d 113, 118 [113 Cal.Rptr. 102, 520 P.2d 726].)

As it stands, plaintiff's complaint is factually deficient. As we have seen, plaintiff connected his injury to the insurance agent's failure to notify CAARP by alleging that CAARP, because it had a duty to consider fitness, would have denied the applicant's request for insurance, that the applicant, if not insured, would have ceased driving, and that therefore the applicant would not have struck plaintiff's truck with his car. If CAARP is under no duty to deny insurance to the applicant, plaintiff's theory of causality obviously breaks down. To connect the agent's failure to act with his injury, plaintiff, as we have also seen, might allege that CAARP would have notified the Department of Motor Vehicles, that the DMV would have revoked the applicant's license, and that the applicant would not have driven without a driver's license; alternatively, plaintiff might eliminate any reference to CAARP, and simply claim that the agent should have notified the DMV.

Because the statute of limitations had run by the time that the trial court dismissed plaintiff's complaint, the question of whether plaintiff could have corrected the factual deficiencies in his complaint through amendment depends upon whether, despite the changes in factual allegations, the amended complaint would nonetheless state "the same general set of facts" as the prior complaint. (*Austin* v. *Massachusetts Bonding & Insurance Co.* (1961) 56 Cal.2d 596, 600 [15 Cal.Rptr. 817, 364 P.2d 681].) In *Grudt* v. *City of Los Angeles* (1970) 2 Cal.3d 575, 584-585 [86 Cal.Rptr. 465, 468 P.2d 825], we held that the *Austin* test was met where plaintiff, widow of a man shot to death by police, amended her complaint to allege not only that the police had intentionally and wrongfully killed her husband, but also that the city was responsible for its negligent supervision of these particular police officers, inasmuch as it knew or should have known of their prior misconduct. We acknowledged that the amended complaint "added a significant new dimension to the lawsuit" (*id.*, at pp. 583-584) inasmuch as it added the new allegations concerning the prior police misconduct and the city's knowledge of that misconduct. Nonetheless, we held that the new facts were merely "additional." (*Id.*, at p. 584.) Plaintiff's amended complaint asserted the same basic facts: it recited "the same acts by [the police] as the gravamen of the action," and still sought recovery "to compensate plaintiff for the loss of her husband." (*Id.*)

*Grudt* suggests that the new facts plaintiff would need to allege here would also be merely "additional." The amended complaint would assert the same basic facts: the insurance agent would be charged with the same act of omission, the failure to take reasonable steps as to the information upon the applicant's unfitness,[3] and plaintiff's injury would stay the same, that incurred in the accident. Because plaintiff, therefore, could have amended his complaint to correct its factual deficiencies, the trial court erred in dismissing plaintiff's complaint without leave to amend, and the majority errs in judging the complaint as is.

To reach its result, the majority must either usurp the function of the trier of fact or hold plaintiff to his deficient pleading contrary to our usual rule of liberal construction. I would do neither. An insurance agent is not free to ignore his responsibility to the public at large in the event that the agent, in the course of dealing with a client, acquires information indicating that the client is unfit to drive. Fairly read, plaintiff's complaint suggests that defendant Klassen breached his duty to the public. We should reverse the judgment of the trial court and allow plaintiff an opportunity to amend his complaint.

Appellant's petition for a rehearing was denied March 30, 1977. Sullivan, J.,* did not participate therein. Tobriner, J., was of the opinion that the petition should be granted.

---

[3]Read literally, plaintiff's complaint alleges only that the agent failed to notify CAARP. This allegation, of course, might be sufficient if plaintiff were to proceed on the theory that CAARP would have notified the DMV. In order to find in plaintiff's complaint an allegation that the agent notified no one, and thus a basis for the theory that the agent should have notified the DMV directly, we cannot read plaintiff's complaint literally. An allegation that the agent did nothing whatsoever with the information seems to be implicit in plaintiff's complaint, however; under the rule of liberal construction, therefore, we should treat this implicit allegation as part of the complaint. (Cf. *Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at p. 432, fn. 3 [allegation that psychiatrist failed to notify victim treated as part of complaint which literally alleges only that psychiatrist failed to notify victim's parents].)

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.