Filed 8/31/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| COASTAL HILLS RURAL PRESERVATION,<br><br> Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF SONOMA et al.,<br><br> Defendants and Respondents;<br><br>JACK PETRANKER et al.,<br><br> Real Paries In Interest. | A145573<br><br>(Sonoma County<br>Super. Ct. No. SCV255694) |

This action was brought under the California Environmental Quality Act (CEQA)[1] to challenge the proposed expansion of a Buddhist retreat center approved by defendant County of Sonoma (County). The County adopted a mitigated negative declaration (MND) in lieu of a formal environmental impact report (EIR) in approving the third in a series of master use permits (MUPs) for real parties in interest Jack Petranker and the Head Lama of the Tibetan Nyingma Meditation Center (TNMC). Plaintiff Coastal Hills Rural Preservation (CHRP) is a citizens' group that contends the County violated CEQA by approving the master use permit without an EIR. CHRP petitioned the trial court for a writ of mandate, maintaining that an EIR was required because the proposed project greatly expands an existing printing press operation that is housed on the subject property, which is located in a rural area. CHRP also asserted the approval was made in

---

[1] Public Resources Code sections 21000 through 21178. Unless otherwise indicated, all further statutory references are to that code.

violation of the County's general plan and related zoning provisions.  The trial court denied the petition.  We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.    *Background*

In 1975, TNMC purchased a property on Tin Barn Road in Cazadero, which it uses as a monastery and retreat center for senior members of its community (Odiyan Retreat Center).  Since the 1970's, a significant religious practice of TNMC has been the printing of sacred Buddhist texts in the Tibetan language for shipment to Asia and free distribution to Buddhist monks, nuns, and lay practitioners whose libraries have been destroyed by Chinese authorities.

In 1983, the County approved a conditional use permit for Timberhill Ranch (Timberhill), a resort also located in Cazadero.[2]  The property is within an area designated as Resources and Rural Development (RRD) in the County's general plan.  Timberhill's use permit allowed for the construction of a lodge facility, a dining room, and 15 guest cabins.

In 2000, the County's Permit and Resource Management Department (PRMD) adopted an MND allowing the expansion of Timberhill to include five additional cabins, a new dining room and other guest facilities, and 10 dwelling units for staff housing.

In 2004, TNMC purchased Timberhill and designated the property as the Ratna Ling Retreat Center (Ratna Ling).[3]  We hereafter refer to real parties in interest collectively as Ratna Ling.

### II.    *History of Ratna Ling's Use Permits*

#### A.  *2004 Master Use Permit Application*

On April 15, 2004, Ratna Ling submitted a modified master use permit application (2004 MUP) to construct 19 additional cabins, a library, a healing center, a therapeutic pool, and a new 18,750-square-foot printing press facility on the Timberhill site.  The

---

[2] The Timberhill Ranch property is 107 acres in size.

[3] Ratna Ling means "jeweled crest."

2

proposed maximum number of occupants was set at 60, comprised of up to 20 residents and 40 retreatants. The application also sought permission to convert the existing 13,394-square-foot lodge into a meditation hall with a kitchen and dining facilities, as well as to continue utilizing the property's other existing structures. Ratna Ling estimated the total number of truck trips for the press operation and for supplies to be 0.5 per day, with total round trips for retreatants and staff at an average of 17 per day. The application was unopposed.

On July 21, 2004, the PRMD filed an initial study, indicating that an MND would be prepared. Out of 17 environmental factors considered, the seven deemed potentially affected by the proposed project were (1) aesthetics, (2) biological resources, (3) utilities/service systems, (4) cultural resources, (5) hydrology/water quality, (6) air quality, and (7) transportation/traffic.

On September 9, 2004, the County's Board of Zoning Adjustments (BZA) adopted an MND (2004 MND) and approved the 2004 MUP, subject to 58 conditions of approval. Within the conditions of approval, the printing press operation was designated as a noncommercial "ancillary use." Maximum occupancy for the printing press facility was limited to 27 persons, with hours of operation from 7:00 a.m. to 10:00 p.m. seven days a week. The staff report prepared in conjunction with the 2004 MND states: "Total production at the press facility is estimated at a little under 100,000 books (including art) per year. To print this many books requires approximately twelve 40-foot truckloads of paper, or about one truckload per month. The other supplies required, such as ink and plates, would come in smaller trucks, at a rate of about one every three months."[4] The staff report also reflects that the facility was intended to house a single printing press, along with related pieces of equipment.

---

[4] These estimates are identical to estimates provided by Ratna Ling in its MUP application.

3

### B. Post-2004 MUP Proposals and Activities

Not long after the 2004 MUP was approved, Ratna Ling's printing press activities intensified. In 2006, the TNMC publishing entity known as Dharma Publishing closed its printing facility in Berkeley. TNMC transported five printing presses from Berkeley to Ratna Ling and placed them alongside the existing printing press in the 18,750-square-foot building. Ratna Ling initiated communications with the County, seeking to further expand its onsite printing operation. An e-mail message to Petranker sent by a deputy director with PRMD on November 27, 2006 opined that Ratna Ling's tentative proposal to construct a four-story 95,000-square-foot "text treasury" "would appear to make the printing and warehouse the predominant use," rather than a permissible "accessory use"[5] under the County's general plan and zoning regulations. The e-mail further noted: "Your use permit allows the printing press and 18,000 sf of storage space, which we consider about the limit of what is reasonable for an accessory use." The message explained: "An accessory use must be incidental to the primary use and must not 'significantly change the character, appearance or operation of the principal use of the building or property.' "

On August 1, 2007, the PRMD approved Ratna Ling's zoning permit application for a small residential care facility to house up to six persons.

### C. 2008 Planning Application and Permits

On February 26, 2008, Ratna Ling submitted a planning application seeking a general plan amendment/special area policy and a use permit to construct two large underground caves for text storage, as well as a large exhibition/assembly hall.

On March 26, 2008, Ratna Ling received a temporary zoning permit for two steel-frame membrane storage tents to house its "Sacred Text Treasury." The permit was later revised to include two additional storage tents. The four storage tents have a combined

---

[5] The County reportedly uses the terms "ancillary use" and "accessory use" interchangeably.

square footage of 39,270 square feet, which is more than double the size of the printing press facility. The permit was to expire on March 25, 2011.

On June 19, 2008, Ratna Ling acquired an adjacent 13-acre parcel, increasing the retreat center's total land area to 120 acres.

On August 22, 2008, the PRMD adopted an MND (2008 MND) and approved a use permit allowing Ratna Ling to construct a 20-acre-foot reservoir for the site's water system, and to modify the size and location of the healing center.

### D. Neighbor Opposition and Response

On January 8, 2009, a petition supported by 99 signers was filed with the PRMD in opposition to Ratna Ling's planning application for the underground caves and exhibition/assembly hall.

On February 25, 2010, the "Steering Committee to Oppose Ratna Ling Expansion" (ORLE) filed a complaint with 172 signatures (Complaint) with the PRMD. The Complaint alleged Ratna Ling had been operating in violation of the conditions of approval contained in the 2004 MUP, as well as in violation of the County's general plan and zoning regulations. Specifically, ORLE alleged the printing press operation had exceeded its ancillary function, noting that the current combined square footage of the printing facility and the four temporary storage tents was equal to the square footage of Ratna Ling's retreat-related facilities. Its six printing presses were allegedly operating 24 hours a day, six days a week, with up to 40 workers on site per day. Additionally, truck traffic had increased 12 to 16 times over Ratna Ling's reported 2004 estimate. ORLE included extensive background information and documentation of the alleged violations.

In an April 19, 2010 letter to Supervisor Efren Carrillo, Petranker responded to the Complaint's allegations, observing the term " 'ancillary,' reinforced by the Oxford English Dictionary, is that it means 'providing essential support.' Our book production is a central religious practice and provides essential support to the primary purpose of Ratna Ling and Odiyan as places for retreat, contemplation, meditation, prayer, and the spread of the Dharma." In noting the many permits Ratna Ling had obtained since 2004, Petranker stated: "Over the years, we have repeatedly demonstrated our willingness to

5

co-operate with the County. Most ironically, the very fact the neighbors cite as a 'problem'—that we have obtained more than 200 permits—demonstrates that we have sought and the County has provided thorough, careful oversight of our operations. We've paid the County over $195,000 in fees. We've attended dozens of meetings, filed hundreds upon hundreds of pages of reports, plans, analyses, environmental compliance documents and the like. And that cooperation will continue."[6]

### E. Ratna Ling's 2011 Revised Planning Application

On March 15, 2011, Ratna Ling submitted a revised planning application and proposal statement to the PRMD (2011 Project). The revised application omits the underground caves and the exhibition/assembly hall that were proposed in 2008. In addition to securing permanent status for the four temporary storage tents, Ratna Ling proposed to construct a six-bedroom residence on the newly acquired 13-acre parcel to house 12 occupants.[7] It also proposed to erect up to eight tent cabins "to house a number of volunteers needed to support peak production periods for the sacred text activity," and sought authorization to raise the total occupancy limit for the retreat to 98 persons, with 24 additional persons to be allowed on a seasonal basis.[8]

As to the printing facility, Ratna Ling sought to quantify production based on a limit of one 24-foot truck per day to bring in supplies and transport out finished works for shipment, rather than limiting the number of books to be produced. The proposal requested a storage use not to exceed the combined square footage of the four temporary storage tents. Additionally, it provided that authorization for the printing facility would terminate if the property were to be conveyed to a third party not affiliated with the

---

[6] The total volume of reports, plans, analyses, and environmental documentation contained in the administrative record is quite substantial. It is unclear whether the Complaint itself was ever formally addressed.

[7] The proposed size of the house was later reduced to five bedrooms.

[8] Ratna Ling requested that occupancy for the printing facility be increased from 27 to 60 persons for all months except June and July, when the limit would be raised to 80 persons.

traditions and practices of Tibetan Buddhism.  In such case, Ratna Ling would dismantle and remove the printing equipment.

On March 26, 2011, the PRMD approved a one-year time extension for the storage tent permits.

On July 31, 2011, ORLE submitted revisions to its extensive (over 400-page) opposition to Ratna Ling's 2011 Project proposal.

On December 20, 2011, Ratna Ling submitted supplemental information regarding the printing facility, addressing energy efficiency, storage of hazardous materials, and the color of the four storage tents.  An accompanying chart shows the printing operation occupies 1.25 percent of the retreat's total land area, uses 24 percent of the energy at the site, accounts for 37 percent of Ratna Ling's business property value, and generates 5.72 percent of the total vehicular traffic.  The document reiterates the importance of sacred text preservation to the Ratna Ling community, noting "[t]he entire community of press volunteers observes strict rules of behavior; they also join in daily rituals held at the press building."  These rituals include chanting traditional Buddhist prayers in the Tibetan language, silent meditation, yoga, traditional water and incense offerings, daily spiritual practices, chanting of mantras, and closing prayers.

### F.  BZA Proceedings

On February 14, 2012, the PRMD released a notice of public hearing and intent to adopt an MND (2012 MND) for the 2011 Project.  The notice indicated the PRMD had identified potential environmental impacts in the following areas:  biological resources, greenhouse gas emission, and transportation/traffic.  That same month, a petition circulated in opposition to the 2011 Project.  The petition appears to have been signed by as many as 390 individuals.  Many letters, both in support and in opposition, are contained in the administrative record.

On April 5, 2012 and June 7, 2012, the BZA conducted public hearings on the 2012 MND.  At the conclusion of public testimony, the BZA, by a five-to-zero vote, adopted the 2012 MND and approved the MUP for the 2011 Project.

On June 7, 2012, Ward Anderson filed an appeal with the board of supervisors (Board), claiming the BZA had failed to address the 2010 Complaint. Anderson also alleged that in approving the 2011 Project, the BZA overlooked "comprehensive rebuttals" that had been advanced against adoption of the 2012 MND.

On October 4, 2012, the attorney for CHRP amended Anderson's appeal to include the claim that the 2011 Project was inconsistent with the County's general plan and zoning regulations. CHRP also asserted the BZA had violated CEQA by adopting an MND instead of requiring the preparation of an EIR.

### G. *Subsequent Mitigated Negative Declaration*

On March 26, 2013, Ratna Ling submitted an updated proposal statement for the 2011 Project. While the updated proposal statement acknowledges Ratna Ling was seeking permanent status for the four storage tents, it does not include the tents in its list of proposed new structures.[9]

On December 2, 2013, an officer with the Timber Cove Fire Protection District (TCFPD) submitted a letter to the PRMD questioning whether the storage tents were in compliance with building code regulations.

On January 21, 2014, Ratna Ling submitted documentation regarding the fire resistance ratings for the storage tents.

On February 12, 2014, the County fire marshal submitted a memorandum to the PRMD stating that sufficient evidence had been provided to show the storage tents were in compliance with required fire resistive requirements for membrane structures. Reportedly, the tents are equipped with sprinkler systems, and the tent fabric has been treated with a flame-retardant chemical.

On February 24, 2014, CHRP refiled the 2010 Complaint. CHRP focused on the industrial character of Ratna Ling's printing operation, asserting it was inconsistent with County land use regulations.

---

[9] In the updated statement, Ratna Ling noted it had donated a new fire truck costing $280,000 to the Timber Cove Fire Protection District, along with $15,000 worth of supplemental equipment.

On February 28, 2014, PRMD released a 46-page subsequent mitigated negative declaration (SMND) to the 2004 MND and the 2008 MND, superseding the 2012 MND. The 2014 SMND assesses the potential environmental effects of the 2011 Project using the 18-factor initial study checklist taken from the CEQA Guidelines. The PRMD found the 2011 Project would have no impact as to six of these factors, and a less-than-significant impact as to 12 of these factors.[10] The SMND identifies measures designed to mitigate all of the identified less-than-significant impacts. PRMD also concluded the storage tents would not expose the area to a significant risk of wildland fires because the structures were built in compliance with the fire safety regulations that were in effect at the time their permits were issued.

### H. Appeal to the Board

On April 1, 2014, CHRP submitted its "Master Issue Statement" in support of its appeal to the Board. The related portion of administrative record contains hundreds of e-mails and comments from various parties.

On April 8, 2014, the Board held a hearing on the appeal of the BZA's 2012 approval of the 2011 Project. After receiving public comments and testimony, the Board closed the hearing and conducted a vote, preliminarily denying the appeal and approving the 2011 Project by a vote of three to two. The Board also directed staff to meet with Ratna Ling to discuss possible revisions to some of the SMND's conditions of approval.

On June 24, 2014, the Board conducted a second public hearing. This hearing was limited to consideration of the revised conditions of approval. The changes included altering the times for operating the printing press, providing $2,500 annually to the TCFPD, and requiring Ratna Ling to coordinate with the County fire marshal and the TCFPD to review its onsite firefighting infrastructure. Again by a three-to-two vote, the

---

[10] The six no-impact factors relate to agricultural and forest resources, biological resources, mineral resources, population and housing, recreation, and the "mandatory findings of significance." The 12 less-than-significant impact factors pertain to aesthetics, air quality, cultural resources, geology/soils, greenhouse gas emission, hazards and hazardous materials, hydrology/water quality, land use and planning, noise, public services, transportation/traffic, and utilities/service systems.

9

Board formally denied the appeal, adopted the SMND, and approved the 2011 Project subject to 96 conditions of approval.

On June 25, 2014, the County recorded a Notice of Determination.

### III.    Trial Court Proceedings

On July 24, 2014, CHRP filed a petition for writ of mandate and a complaint for declaratory and injunctive relief challenging the Board's action. CHRP alleged the Board's decision to forgo preparation of an EIR violated CEQA because the SMND incorporated previously unpermitted activities into the baseline of its analysis. CHRP also argued substantial evidence in the record demonstrated that the 2011 Project will create new and significant environmental impacts with respect to fire hazards, public safety, public services, and land use, impacts that had not previously been analyzed in any CEQA document. Alternatively, CHRP claimed the SMND was not supported by substantial evidence. It also asserted the 2011 Project was inconsistent with the County's general plan and zoning code. Finally, CHRP contended the SMND violates CEQA by deferring the implementation of mitigation measures, and by failing to analyze the cumulative impact of Ratna Ling's activities.

The trial court issued a tentative order denying the petition, and a hearing occurred on March 30, 2015.

On April 7, 2015, the trial court filed its ruling denying the writ. CHRP timely appealed.

### DISCUSSION

### I.    Standard of Review

" '[Code of Civil Procedure] [s]ection 1094.5 makes administrative mandamus available for review of "any final administrative order or decision made as the result of a proceeding in which *by law* a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in the inferior tribunal, corporation, board or officer." ' [Citation.] '[I]mplicit in section 1094.5 is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order.' " (*West*

10

*Chandler Boulevard Neighborhood Assn. v. City of Los Angeles* (2011) 198 Cal.App.4th 1506, 1517 (*West Chandler*).)

" 'In reviewing an agency's decision under Code of Civil Procedure section 1094.5, the trial court determines whether (1) the agency proceeded without, or in excess of, jurisdiction; (2) there was a fair hearing; and (3) the agency abused its discretion. [Citation.]' [Citations.] 'Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.' [Citation.] 'The trial court and appellate court apply the same standard; the trial court's determination is not binding on us.' " (*West Chandler, supra,* 198 Cal.App.4th at pp. 1517–1518, fn. omitted.)

## II.    *CHRP Waived Its Religious Preference Arguments*

Before we address CHRP's land use and environmental claims, we observe CHRP spends much of its opening brief arguing that the County's adoption of the SMND and approval of the 2011 Project violates California Constitutional provisions relating to the establishment of religion. This issue was not raised before the Board and is therefore not ripe for our review.[11] Recognizing this defect, CHRP urges us to exercise our discretion to consider its argument because the issue involves "a pure question of law" and implicates important issues of public policy. We decline the invitation.

Typically, constitutional issues not raised in earlier civil proceedings are waived on appeal. (*Hale v. Morgan* (1978) 22 Cal.3d 388, 394; see *Sea & Sage Audubon*

---

[11] CHRP asserts it did exhaust its administrative remedies, citing to isolated statements made over many years by various individuals that are found in noncontiguous portions of the 13,603-page administrative record. Significantly, neither Anderson nor CHRP expressly identified religious preference as a ground for the appeal to the Board. We further observe any argument based on religion was essentially disclaimed in CHRP's opening brief in the trial court: "Petitioners do not object to the religious nature of the site, and are fully supportive of Ratna Ling as a Buddhist retreat center. Petitioners object to the location of an industrial printing operation in a rural area of Sonoma County that lacks the infrastructure to manage industrial fires and potentially hazardous emergencies associated with industrial operations."

11

*Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417 (*Sea & Sage*); *Thomas v. Duggins Construction Co., Inc.* (2006) 139 Cal.App.4th 1105, 1114.)  A court may relax this rule to permit a party to raise belatedly " 'a pure question of law which is presented on undisputed facts.' " (*Sea & Sage,* at p. 417.)  Only when the issue presented involves purely a legal question, on an uncontroverted record and requires no factual determinations, is it appropriate to address new theories.  (*Palmer v. Shawback* (1993) 17 Cal.App.4th 296, 300.)  "This forgiving approach has been most frequently invoked when 'important issues of public policy are at issue.' " (*Sea & Sage,* at p. 417.)  Its application nevertheless "is largely a question of an appellate court's discretion." (*Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874.)

Furthermore, it also is "the long-established rule that an appellate court will not enter upon the resolution of constitutional questions unless absolutely necessary to a disposition of the appeal." (*Bayside Timber Co. v. Board of Supervisors* (1971) 20 Cal.App.3d 1, 5–6.)  Accordingly, a new constitutional issue may be raised on appeal only if it involves a pure question of law that is absolutely necessary to the disposition of this appeal, and concerns a matter of public interest based on undisputed facts.  The present case does not satisfy this criteria.

In arguing that the County's approval of the 2011 Project violates federal and state constitutional prohibitions against the establishment of religion, CHRP asserts:  "Here, the County approved [TNMC's] massive industrial storage operation and drastic print facility expansion even though the Project would not otherwise be allowed in RRD land, according to the County's own words."  We are unable to evaluate the constitutionality of this assertion without examining the record to assess whether the storage operation is indeed a "*massive industrial*" one, and whether the Board's decision really does allow for a "*drastic* print facility expansion."  Not surprisingly, Ratna Ling and the County both take exception to this characterization of the record.  Thus, the underlying facts are not uncontroverted.

Additionally, the issue does not present itself to us on a clean slate.  TNMC's religious aspirations were clear when it first acquired the Timberhill site and obtained

12

County approval for its printing activities in 2004. It is undisputed that the publication of sacred texts has long been understood to be an outgrowth of Ratna Ling's spiritual practice. According to Ratna Ling, "[m]any people go on retreat primarily for the purpose of working on the sacred texts because ongoing transmission of the Dharma is a central practice of this spiritual community."

Against this backdrop, which includes several prior County approvals that were never challenged, we are being asked to evaluate whether the incremental increase in activities authorized under the SMND, in and of itself, violates constitutional principles concerning the establishment of religion. Framed as such, this narrow, fact-specific issue does not concern a matter of public interest.[12] And even if we could properly exercise our discretion to overlook CHRP's failure to raise this issue in the administrative proceeding below, we would decline to entertain its arguments based on this complex factual background alone.

## III.    *Consistency With The County's General Plan*

### A. *General Principles and Standard of Review*

The Board specifically found the 2011 Project to be consistent with the applicable provisions of the County's general plan and zoning code. CHRP challenges that finding on appeal. This challenge is based on the Planning and Zoning Law (Gov. Code, § 65000 et seq.), rather than CEQA. (See *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 707.)

"Government Code section 65300 requires each county . . . to 'adopt a comprehensive, long-term general plan for the physical development of the county . . . .'

---

[12] Courts typically find public policy justifies appellate consideration when a ruling's impact will extend beyond the parties to the case. (See, e.g., *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 6 [whether to recognize a tort cause of action for intentional first party spoliation]; *De Anza Santa Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz Mobile Estates* (2001) 94 Cal.App.4th 890, 908 [whether Civ. Code, § 798.86 was intended to provide the exclusive penalty for a violation of the provisions of the Mobilehome Residency Law, thus precluding an award of punitive damages for statutory violations].)

13

The general plan consists of 'a statement of development policies . . . diagrams and text setting forth objectives, principles, standards, and plan proposals . . .' and includes, at a minimum, the following seven elements: land use, circulation, housing, conservation, open-space, noise, and safety. [Citation.] The general plan and each of its elements must 'comprise an integrated, internally consistent and compatible statement of policies . . . .' [Citation.] Furthermore, zoning ordinances must be consistent with the general plan." (*No Oil, Inc. v. City of Los Angeles* (1987) 196 Cal.App.3d 223, 242 (*No Oil*).)

"When we review an agency's decision for consistency with its *own* general plan, we naturally accord great deference to the authoring agency's determination. [Citation.] The agency has broad discretion, especially regarding general plan policies, which reflect competing interests. [Citation.] 'A reviewing court's role "is simply to decide whether the [agency] officials considered the applicable policies and the extent to which the proposed project conforms with those policies." ' [Citations.] If the agency's decision is not arbitrary, capricious, unsupported, or procedurally unfair, it is upheld." (*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1192.) We resolve reasonable doubts in favor of the administrative decision. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514–515; *Wollmer v. City of Berkeley* (2009) 179 Cal.App.4th 933, 940.)

We show this deference because the body adopting a general plan has unique competence to interpret those policies when applying them to a proposed project. (*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1563; *San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 515 (*San Francisco Tomorrow*).) Given this expertise, it is not our role to micromanage a local agency's development decisions. (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 638; *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 719.)

### B. The Resources and Rural Development Designation

As noted above, the Ratna Ling site has a RRD land use designation under the County's current general plan, known as "General Plan 2020." The stated purpose of the

14

RRD land use designation is to "protect lands used for timber, geothermal and mineral resource production and for natural resource conservation." The RRD category is intended, in part, to guard against intensive development in fire and flood prone areas, and to protect county residents from proliferation of growth in areas where there are inadequate public services and infrastructure. The RRD designation expressly permits "[l]odging, campgrounds, and similar recreational and visitor serving uses," provided they are not inconsistent with the resource purposes of the area.[13] The County considers the Ratna Ling's operation, like the Timberhill Ranch before it, as a "visitor-serving" use.

The related zoning ordinance also permits visitor-serving uses "where compatible with resource use and available public services." (Sonoma County Code of Ordinances (Sonoma County Code), § 26-10-005.) Allowable uses can include "[a]ccessory" buildings, as well as uses that are appurtenant to the operation of allowable uses. (*Id.*, § 26-10-010, subd. (p).) Uses allowed under an approved use permit include "[n]oncommercial clubs and lodges." (*Id.*, § 26-10-020, subd. (v).)

### C. *The Board's Findings*

In its resolution approving the 2011 Project, the Board found the proposed uses to be consistent with the County's land use regulations because, by that point, Ratna Ling was merely seeking "clarifications and expansions of the *previously approved uses*" (italics added), all of which had been found by the BZA in 2004 to be consistent with relevant land use policies and regulations. In particular, the Board found the printing facility "has been and will continue to be an accessory use permitted under Section 26-10-010(p) of the Zoning Code since it is related to, subordinate to, and appurtenant to the retreat use."[14] The Board further found various arguments seeking to reopen the prior "accessory use" determination for the print facility were untimely.

---

[13] The RRD designation also allows public and private schools and places of religious worship.

[14] Sonoma County Code section 26-10-010, subdivision (p) is titled, "Accessory buildings and uses appurtenant to the operation of the permitted uses." It provides, in part: "Accessory buildings may be constructed on vacant parcels of two (2) acres or more

15

In the resolution approving the 2004 MUP, the BZA found the mitigation measures set forth in the permit rendered Ratna Ling's use "consistent with the RRD . . . General Plan land use designation and the zoning district regulations as a non-commercial retreat center because it would not detract from or impinge upon lands used for timber, geothermal and mineral resource production or natural resource conservation." The 18,750-square-foot religious printing facility was described as "non-commercial," and was deemed "an ancillary use to the monastery and non-commercial retreat center." The BZA also found Ratna Ling's overall activities to be consistent with the RRD land use designation because the retreat operation was "similar to a noncommercial club or lodge."

### D. Argument on Appeal

On appeal, CHRP asserts the project is inconsistent with the County's general plan and related zoning provisions. It contends the County's continued categorization of Ratna Ling as the equivalent of a "noncommercial club or lodge" is unsupported by substantial evidence. CHRP claims the Board's approval "sanctions rampant commercial activity already taking place and permits [Ratna Ling] to store commercial products, as they are produced, in the immense warehouses as inventory." Specifically, it points to the "extraordinary levels of manufacturing productions (books and objects), massive storage structures and commercial Internet sales."

As the County notes, there is no evidence in the record that Ratna Ling's printing activities are undertaken for profit. The undisputed evidence is that 89 percent of Ratna Ling's total revenue is generated by its retreat use, with 11 percent coming from the printing press use. Ninety-eight percent of its total printing output is given away for free. Two percent of this output is used to produce religious texts in English, which are offered for sale. The revenue generated by these sales is then used to support the production of more religious texts. The record shows that Internet sales generated $6,000 per month for

---

in advance of a primary permitted use." "Accessory use" is defined in Sonoma County Code section 26-02-140 as "a use of land or a building that is related to and subordinate to the primary use of the land or building located on the same lot."

16

Ratna Ling in 2014. By contrast, the retreat use produces an average of $450,000 in income per year, or $37,500 per month. Notably, CHRP does not argue that the retreat use is a commercial activity, even though that use generates six times more income per year for Ratna Ling than the printing use. Accordingly, we disagree with CHRP's claim that Ratna Ling's printing operation is inconsistent with its primary function as a religious retreat merely because some of its output enters the stream of commerce.

CHRP also urges that the "industrial-size storage structures and expanded press operations" should be deemed "industrial" uses for purposes of land use regulation, and that the County erred in finding these uses to be consistent with the RRD criteria.[15] While it is undeniable that Ratna Ling's printing activities have intensified over time, we cannot say the County abused its discretion in categorizing the printing use as ancillary to the retreat center use. As a qualitative matter, the printing press use has been permitted since 2004, and the time within which to make any challenge to that qualitative determination has passed.

Further, our review of the administrative record, including the Board's 15-page resolution dated June 24, 2014, confirms that the Board fully considered the County's land use policies and the extent to which the 2011 Project conforms to those policies. The Board specifically found Ratna Ling's housing of sacred texts in the storage tents was not an industrial use, but was an accessory use to the religious retreat. CHRP stresses that the 2011 Project "exposes county residents to a fire department unequipped for industrial fires and narrow rural roads burdened by large trucks and increased traffic." Suffice it to say, our review of the administrative record shows the Board fully considered the "industrial" aspects of Ratna Ling's printing operation, including the potential impacts related to fire safety.

_____

[15] Industrial uses are not necessarily prohibited in RRD zones. As the County notes, with a conditional use permit the RRD designation and related zoning regulations allow for intensive industrial uses, including large-scale geothermal power plants, energy transmission facilities and pipelines, biomass energy facilities, oil and gas production wells, mining, hardrock quarries, and lumber mills. (Sonoma County Code, § 26-10-020, subds. (t), (jj).)

17

We acknowledge the decision to allow for the printing press expansion was controversial, as evidenced by the Board's three-to-two vote in favor of approval. Nevertheless, under the deferential standard that governs our review, we will not reweigh conflicting evidence nor substitute our views for those of the Board. (*San Francisco Tomorrow, supra,* 229 Cal.App.4th at p. 514.)

## IV.   *The Board Did Not Violate CEQA*

### A. *The CEQA Review Process*

We now turn to CHRP's CEQA claims. "CEQA is a comprehensive scheme designed to provide long-term protection to the environment. [Citation.] In enacting CEQA, the Legislature declared its intention that all public agencies responsible for regulating activities affecting the environment give prime consideration to preventing environmental damage when carrying out their duties. [Citations.] CEQA is to be interpreted 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112.)

"The 'heart of CEQA' is the EIR, whose purpose is to inform the public and government officials of the environmental consequences of decisions before they are made." (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 687–688.) With certain limited exceptions, a public agency must prepare an EIR whenever substantial evidence supports a fair argument that a proposed project "may have a significant effect on the environment." (§§ 21100, 21151, 21080, 21082.2; Cal. Code Regs., tit. 14 (Guidelines), §§ 15002, subd. (f)(1), (2), 15063;[16] *No Oil*, *supra*, 13 Cal.3d at p. 75.) A " '[s]ignificant effect on

***

[16] The Guidelines are regulations "prescribed by the Secretary for Resources to be followed by all state and local agencies in California in the implementation of" CEQA. (Guidelines, § 15000; § 21083.) "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5.)

the environment' " means "a substantial, or potentially substantial, adverse change in the environment."  (§ 21068; see Guidelines, § 15382.)

If conditions imposed upon the project "avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur," and "there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment," an MND may be adopted in lieu of an EIR.  (§ 21064.5.)

### B.  *The Fair Argument Test Does Not Apply*

CHRP and amicus curiae Friends of the Gualala River and Forest Unlimited (FoGR) argue that the "fair argument" test applies to our review of the Board's decision to proceed with an SMND in lieu of an EIR because the change in the status of the storage tents from temporary to permanent constituted a new project under CEQA, as opposed to a modification of Ratna Ling's prior MUPs.  We elect to apply substantial evidence review to the Board's decision to adopt the SMND.  (See *Latinos Unidos de Napa v. City of Napa* (2013) 221 Cal.App.4th 192, 202.)[17]

In *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1135, our Supreme Court observed:  "[T]he 'fair argument' test has been applied *only* to the decision whether to prepare an original EIR or a negative declaration."  "Section 21166[18] provides that once an agency prepares an EIR, no EIR shall thereafter

---

[17] We note the issue of whether an agency's decision to forgo preparation of an EIR under section 21166 is reviewed under a substantial evidence standard or subject to an initial de novo determination is currently before the California Supreme Court.  (*Friends of the College of San Mateo Gardens v. San Mateo Community College Dist.* (Sept. 26, 2013, A135892 [nonpub. opn.]), review granted Nov. 5, 2013, S214061).)

[18] Section 21166 provides: "When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs:  [¶]  (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report.  [¶]  (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report.  [¶]  (c) New information, which was not known and could

19

be required for the project unless certain statutorily prescribed circumstances occur, such as substantial changes to the project or to the circumstances under which the project is being undertaken.  Guidelines section 15162 [citation] provides a similar limitation on subsequent environmental review following an agency's adoption of a negative declaration.  Guidelines section 15162 has been held to be a valid regulation that implements the principles contained in section 21166." (*Abatti v. Imperial Irrigation Dist.* (2012) 205 Cal.App.4th 650, 653, fn. omitted, citing *Benton v. Board of Supervisors* (1991) 226 Cal.App.3d 1467, 1479–1481 (*Benton*).)

CHRP relies on *Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316 (*Sierra Club*).  That case is distinguishable.  In *Sierra Club,* the county had certified a program EIR for a resource management plan that regulated mining.  The plan specified lands available for future mining and provided for preservation of identified agricultural lands. (*Sierra Club,* at pp. 1313–1314.)  Years later, a mining company proposed to amend the EIR to designate for mining a large parcel that had been identified as agricultural in the EIR.  (*Id.* at p. 1314.)  We held that the deferential review provided by section 21166 did not apply in this context because the proposed project was not "either the same as or within the scope of" the program described in the EIR (*id.* at p. 1321), which had expressly exempted the agricultural land from future mining.  (*Id.* at p. 1320.)

The present case is more similar to *Benton.*  In *Benton,* a county board of supervisors had previously issued an MND in connection with a use permit for the construction of a winery on a particular parcel of land.  (*Benton*, *supra*, 226 Cal.App.3d at p. 1473.)  The owner of the land acquired an adjoining parcel and nine months later applied for another use permit, seeking permission to build the winery on the new parcel. The planning commission compared what the owner could construct under the first permit to what it requested in the new application, approved grading and use permits, and adopted a new MND.  (*Ibid*.)  The appellant sought to set aside the MND and the use permit, and compel the preparation of an EIR.  (*Id*. at p. 1474.)

not have been known at the time the environmental impact report was certified as complete, becomes available."

20

On appeal, the *Benton* court found even though the county staff labeled the new application as one for a new permit, the planning commission had treated the application as if it were a request for modification of the already permitted project. (*Benton*, *supra*, 226 Cal.App.3d at p. 1476.) Staff explained that the owner had already acquired vested rights to build under its initial use permit and could build the existing winery as previously approved, and the commission limited its review to a comparison between what had already been approved and what was being proposed. (*Ibid.*) Because the new application was a modification, a limited review was appropriate: "[The winery's] initial project received full CEQA review; only those aspects of the proposal that were changed as a result of the modified winery plan were subject to later CEQA review." (*Id.* at p. 1477, fn. 10; see *Fund for Environmental Defense v. County of Orange* (1988) 204 Cal.App.3d 1538, 1552–1553; *Temecula Band of Luiseño Mission Indians v. Rancho Cal. Water Dist.* (1996) 43 Cal.App.4th 425, 438–439.)

As in *Benton, supra*, 226 Cal.App.3d 1467, here we deal with a purported modification to a project after initial environmental documents, i.e., the 2004 MND and the 2008 MND, had been adopted. The printing press operation was authorized in 2004 after an initial study was conducted and an MND was prepared. The Board concluded the 2011 Project would not result in any significant changes in circumstances or impacts under Guideline section 15162, concluding only an addendum to the 2004 and 2008 MNDs was required. However, since addendums are not circulated to the public, the County elected to prepare the SMND.

The County's decision was proper. While the storage tents were not included in the prior environmental documents, it is undisputed that these structures are integral to Ratna Ling's existing printing press operation. Further, unlike the mining of exempt agricultural land in *Sierra Club*, *supra*, 6 Cal.App.4th 1307, the storage tents do not violate any prior approved conditions. Moreover, as we discuss below, there is substantial evidence that the 2011 Project will not expose people or structures to a significant risk of loss, injury or death involving wildland fires. Accordingly, we review

21

the record to determine if substantial evidence supports the County's adoption of the SMND.

### C. The SMND Is Supported by Substantial Evidence

#### 1. Scope of Our Review

In considering whether the Board's decision to adopt the SMND is supported by substantial evidence, the scope of our review is identical with that of the superior court. (*Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 334.) We examine all relevant evidence in the entire record, considering both the evidence that supports the administrative decision and the evidence against it, in order to determine whether or not the findings of the agency are supported by substantial evidence. (*Id*. at p. 335.) Substantial evidence is evidence of ponderable legal significance, reasonable in nature, credible, and of solid value, evidence that a reasonable mind might accept as adequate to support a conclusion. (*Ibid*.) The burden is on the appellant to show there is no substantial evidence to support the findings of the agency. (*Id.* at p. 336.)

#### 2. Wildland Fire Impact

CHRP asserts the Board improperly concluded that the 2011 Project will not have a significant impact with respect to wildland fires. While acknowledging the region benefits from a community-wide mutual aid agreement that provides supplemental fire protection in the event of an emergency, CHRP faults the Board for failing to analyze the response times of the other districts or their ability to "fight an industrial fire at the Project site." It also faults the Board for relying on statements made by the current fire marshal because she indicated that fire officials expected to engage in continued discussions with Ratna Ling to assess fire risks, hazards, and mitigation measures.

Our review of the record shows substantial evidence supports the Board's conclusion that the fire risks posed by the storage tents were adequately mitigated. For example, as we have already noted, the membrane covering the steel framed storage tents

was found to have met applicable fire protection standards.[19]  There is evidence in the record that the fabric is self-extinguishing and "cannot support combustion nor contribute fuel to a fire."  The tents also have heat detection and fire sprinkler systems, along with a backup generator.  Ratna Ling has 200 to 300 feet of defensible space around each tent.  A condition of approval requires Ratna Ling to provide and maintain its own onsite fire engine.

---

[19] FoGR contends the 2014 SMND fails to apply the appropriate California Building Standards Code provisions (Cal. Code Regs., tit. 24) (CBC) to its analysis of the storage tents, noting the tents do not meet the wildfire protection standards in Chapter 7A of the CBC.  It notes that no membrane fabric structures currently meet the higher standards imposed by Chapter 7A.  However, it is undisputed that the stricter standards did not become effective until January 2010, well after the storage tents were permitted.

During oral argument, appellant contended the now permanent tents were not covered by the 2007 CBC but by the 2011 CBC.  The county maintained the structures approved in the 2008 MUP were regulated by the 2007 CBC.  The county's position was previously detailed in a letter from DeWayne Starnes, Chief Building Official for Sonoma County, to counsel for Ratna Ling, dated October 10, 2013.  Under Chapter 7 of the Sonoma County Code, the existing CBC in place at the "time an application for building permit is submitted shall apply to the plans and specifications for, and to the construction performed under, that permit. . . ." (Sonoma County Code, § 7.13, quoting CBC, § 101.9; see CBC, § 102.6.)  The permits to store manuscripts and books were submitted during 2008.  Hence, the 2007 CBC applied.  Any change arising by a later modification in the 2010 CBC does not apply, according to the PRMD.  Starnes's letter also states that "changing the classification of the tent structures from temporary to permanent has no practical effect.  When PRMD reviewed and checked the plans for the tent structures, PRMD *required* that the tent structures meet all criteria for *permanent structures* [under the existing CBC].  The change from temporary to permanent is not a change of occupancy under the CBC that triggers any additional requirement." (Italics added.)

The determination of the applicable features of the CBC to a county project was an appropriate conclusion by Starnes in his position as the Chief Building Official of the county.  As such it is entitled to deference. (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 219.)  "We have generally accorded respect to administrative interpretations of a law and, unless clearly erroneous, have deemed them significant factors in ascertaining statutory meaning and purpose." (*Nipper v. California Auto. Assigned Risk Plan* (1977) 19 Cal.3d 35, 45.)  Counsel for appellants presents no case authority for us to deviate from this position.

Additionally, Vern Losh, a qualified fire professional with 40 years of experience, who previously served as the Chief/Director of the County's Department of Emergency Services from 1995 through 2008, testified that he had never seen a large-scale fire or even a significant fire event originate from a structure that has heat detection, automatic sprinklers, and defensible space. In sum, we find substantial evidence supports the Board's conclusion that the conditions of approval contained in the SMND adequate address any outstanding fire safety concerns.

### 3. Baseline Argument

CHRP and FoGR claim the county improperly included the storage tents in the baseline assumptions of its environmental impact analysis. "To decide whether a given project's environmental effects are likely to be significant, the agency must use some measure of the environment's state absent the project, a measure sometimes referred to as the 'baseline' for environmental analysis." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 315 (*Communities for a Better Environment*).) Under the Guidelines, "the baseline 'normally' consists of 'the physical environmental conditions in the vicinity of the project, as they exist at the time . . . environmental analysis is commenced . . . .' " (*Communities for a Better Environment,* at p. 315, citing Guidelines, § 15125, subd. (a).) "This is so even if the current condition includes unauthorized and even environmentally harmful conditions that never received, and, as a result of being incorporated into the baseline, may never receive environmental review." (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 249.)

Not surprisingly, the SMND notes that the storage tents were part of the existing physical conditions on the site. However, the storage tents were not simply carved out of the impact discussion in the SMND. Our review of the record shows the Board fully considered its own regulations and policies, as well as the fire hazards posed by the storage tents, conditioning its approval on compliance with comprehensive fire safety mitigation measures. We disagree with FoGR's assertion that the county failed to analyze the potential environmental impacts created by the tents. Instead, we agree with

24

the County's assertion that FoGR's brief "simply ignore[s] the extensive fire protection and suppression measures that applied to the project."

The record indicates that the storage tents were fully evaluated by the Board. The SMND discloses that inspections and site visits had confirmed the structures were operating with appropriate fire safety measures. Moreover, the fire marshal required Ratna Ling to upgrade the tents' existing sprinkler systems, which it agreed to do. Ultimately, the Board required Ratna Ling to have its own fire truck on site along with a minimum of two trained and qualified volunteer firefighters to respond to emergency calls. Even if the storage tents were improperly incorporated into the SMND's baseline, we again find substantial evidence supports the conclusion that the SMND adequately addresses the fire safety concerns raised by the storage tents.

### 4. *Wildlife Hazard Mitigation Plan*

FoGR also asserts the County erred in not following chapter 4 (Wildfire Hazard and Risk Assessment) of its own Hazard Mitigation Plan. That plan provides, in part, "*New buildings* located in any Wildland-Urban Interface Fire Area designated by the enforcing agency shall comply with the Wildland-Urban Interface Fire Area Building Standards which establish minimum standards for buildings in Wildland-Urban Interface Fire Areas." (*Id*., § 47.5, italics added.) The mitigation plan was adopted effective October 25, 2011, well after the four storage tents at issue here were permitted and constructed. FoGR does not cite to any provision that requires existing structures to comply with these building standards.

### 5. *Deferred Mitigation*

FoGR claims the County improperly deferred study of fire impacts until after adoption of the SMND. Condition 82 of the 2014 SMND provides: "The applicant shall coordinate with the Sonoma County Fire Marshal and the [TCFPD] to review the previously approved and existing onsite fire fighting infrastructure for the sacred text storage structures and to install any additional onsite infrastructure deemed appropriate by the Sonoma County Fire Marshal."

25

CEQA usually requires mitigation measures to be defined in advance. (Guidelines, § 15126.4, subd. (a)(1)(B); *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1027.) But deferral is permitted if, in addition to demonstrating some need for deferral, the agency (1) commits itself to mitigation; and (2) spells out, in its environmental impact report, the possible mitigation options that would meet "specific performance criteria" contained in the report. (*Id*. at pp. 1027–1029; § 21100, subd. (b)(3).)

In our view, Condition 82 does not constitute unlawful deferred mitigation. In *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 794–796, which addressed CEQA review of a proposed residential development, the EIR included several mitigation measures that required the developer to conduct studies and develop plans for regulating the fuel used during construction, tree restoration, and water runoff, subject to specified criteria and the approval of appropriate local agencies. The appellate court found no improperly deferred mitigation. (*Ibid.*)

We reach the same conclusion here. The mitigation measure requires Ratna Ling to comply with all fire-related conditions, and does not defer the implementation of any of these requirements. Rather, it grants the County the right to impose new, stricter requirements should such requirements be deemed necessary, without first having to initiate an enforcement action. Accordingly, there is no unlawful deferred mitigation.

## V.     *The County's Approval Did Not Involve Spot Zoning*

Finally, we agree with Ratna Ling and the County that CHRP cannot argue on appeal that the County engaged in impermissible spot zoning when it approved the Project. As with its religious preference argument, this issue was not squarely raised during the administrative proceeding.

Regardless, the case CHRP primarily relies on, *Neighbors in Support of Appropriate Land Use v. County of Tuolumne* (2007) 157 Cal.App.4th 997 (*Neighbors*) is inapposite. The precise issue in that case was whether Government Code section 65852 "prohibit[s] a county from granting a parcel's owner the right to engage in a use prohibited to all other parcels in the same zone, even though it does not rezone the

26

property, amend the ordinance to permit the use, grant a valid conditional use permit, or grant a variance[.]" (*Neighbors*, at p. 1008.) Government Code section 65852 provides: "All such [zoning] regulations shall be uniform for each class or kind of building or use of land throughout each zone, but the regulation in one type of zone may differ from those in other types of zones." Nothing in the record or in the relevant zoning regulations suggests that the use the County has authorized with respect to Ratna Ling is prohibited as to all other parcels in the same zone.

## DISPOSITION

The judgment is affirmed.

_____
DONDERO, J.

We concur:


_____
HUMES, P. J.


_____
MARGULIES, J.

27

Trial Court:   Sonoma County Superior Court

Trial Judge:   Hon. Elliot Lee Daum

Counsel:

Provencher & Flatt LLP, Janis H. Grattan for plaintiff and appellant Coastal Hills Rural Preservation.

O'Brien Watters & Davis LLP, Noreen Evans for Friends of the Gualala River and Forest Unlimited as amici curiae on behalf of plaintiff and appellant.

American Athiests Legal Center, Amanda Knief for American Atheists as amicus curiae on behalf of plaintiff and appellant.

County Counsel of Sonoma County, Bruce D. Goldstein, County Counsel, Verne Ball, Deputy County Counsel for respondents County of Sonoma, Sonoma County Board of Supervisors, Sonoma County Permit and Resource Management Department.

Clement, Fitzpatrick & Kenworthy, Law Offices of Tina Wallis, and Christina Wallis for real parties in interest Jack Petranker and The Head Lama of the Tibetan Nyingma Meditation Center.

A145573